UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

RUBIN WEEKS,                          )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )        Case No. 1:17-CV-22-AGF
                                      )
KIMBERLY BIRCH, et al.,               )
                                      )
                    Defendants.       )

## MEMORANDUM AND ORDER

This matter is before the Court on two motions for summary judgment filed by

Defendants Corizon Health, Inc., the Missouri Department of Corrections, and their

respective employees,[1] in this action brought by Plaintiff Rubin Weeks under 42 U.S.C.

§ 1983.  ECF Nos. 219 and 224.  Plaintiff asserts that the Corizon Defendants denied him

adequate medical treatment in deliberate indifference to his serious medical needs by

refusing to provide MRIs and spinal surgery for several years (Count I) and for failing to

provide proper post-operative care and accommodations after he finally received the

surgery (Count III).  Plaintiff further asserts that the MDOC Defendants used excessive

---

[1]     The Corizon Defendants are Corizon Health, Inc., and several of its health care
professionals: Thomas Bredeman, Kimberly Birch, Rebekah Graham, Nina Hill, Larry
Graham, Lameta McNeil, Becky Lizenbee, Katherine Barton, Molly Leija, Trisha
Brewer, Stacey Hawkes, Coralee Prettyman, and Karissa Rollins.

        The MDOC Defendants are the MDOC itself and several of its employees:
Director Anne Precythe, Alan Earls, Jay Cassady, Walter Friesen, Jody Barck, Daniel
Moses, Gregory Kottwitz, Curtis Whittle, and Rick Patten.

        For simplicity, the Court will refer to these distinct Defendant groups as "Corizon"
and "MDOC" and will refer to individual Defendants by name.

force in transporting him from the hospital after his surgery (Count II).  For the reasons set forth below, both motions will be granted as to all Defendants.

**BACKGROUND**

Viewing the evidence and all reasonable inferences in the light most favorable to Plaintiff for purposes of the motion before the Court, the record establishes the following.

### Plaintiff

Plaintiff has been in the custody of the MDOC since 1992.  As of at least 2005, he was housed in the South Central Correctional Center (SCCC) in Licking, Missouri.  In December 2008, he was transferred to the Southeast Correctional Center (SECC) in Charleston, Missouri, where he resided for the duration of the period relevant here.[2] Prior to his incarceration, Plaintiff was injured in an off-shore drilling platform explosion resulting in damage to his spine and right leg and necessitating multiple surgeries and the implantation of a steel bolt in his right ankle.  Plaintiff later suffered another traumatic injury to his spine and lower extremities when he fell from a semi-truck.

### Corizon Defendants

Corizon is the contracted medical provider responsible for providing medical care and treatment to MDOC inmates.  MDOC defers to Corizon and its physician employees to make decisions regarding in-house treatment and any need for outside services.

---

[2] Although Plaintiff has not filed a change of address notice with this Court, MDOC's offender locator indicates that he is currently housed in the Eastern Reception Diagnostic Correctional Center in Bonne Terre, Missouri.

During the period relevant to Plaintiff's claims, Dr. Thomas Bredeman was the Associate Regional Medical Director charged with overseeing services for several facilities, including SECC and the Jefferson City Correctional Center (JCCC).  One of Dr. Bredeman's responsibilities was to review offenders' and physicians' requests for medication and outside referrals.  Dr. Kimberly Birch was Medical Director at SECC, in which role she supervised the medical care provided to offenders.

Nurse Molly Leija was the Health Services Administrator at SECC.  One of her duties was to investigate and respond to offenders' formal grievances.  Nurse Katherine Baron was Corizon's Director of Nursing at SECC.  One of her duties was to investigate offenders' Informal Resolution Requests (IRR) and prepare grievance responses.

Nurses Nina Hill and Rebekah Graham were nurse practitioners at SECC.  One of Nurse Graham's duties was to oversee chronic care for offenders with last names beginning in L through Z, thus including Plaintiff.  Nurses Larry Graham, Becky Lizenbee, and Lameta McNeil were registered nurses at SECC.  Nurses Trisha Brewer, Caralee Prettyman, and Karissa Rollings were nurses at JCCC, where Plaintiff spent the night after his surgery before returning to SECC the next day.

Nurse Stacey Hawkes was Utilization Management Specialist for Hospitalization. Her role was to obtain information from a hospital upon a patient's discharge (e.g., doctor's instructions, patient notes) and forward that information to the correction facility.  She did not see or treat patients.

3

**MDOC Defendants**

Anne Precythe was the Director of MDOC.  Alan Earls was Deputy Division Director of Adult Institutions for MDOC.  Jay Cassady was Warden of JCCC.  Officers Walter Friesen, Jody Barck, Daniel Moses, Gregory Kottwitz, Curtis Whittle, and Rick Patten were corrections officers at JCCC.

**Grievance Process (ECF No. 220-5)**

When an offender wishes to assert a grievance, the first step is to submit an IRR within 15 days of the incident.  For medical grievances, a nurse is assigned to the matter to review the complaint and discuss solutions with the offender.  Absent resolution, a written response is issued within 40 days of the IRR.  If the offender remains unsatisfied, he must file a formal grievance within 7 days of the response.  A grievance officer or other designated staff member reviews the matter and prepares a response, which is reviewed with the offender in person.  An offender may then file a grievance appeal to be reviewed by the division director or other designee.  Plaintiff asserts that Corizon's responses to his grievances were often untimely.  ECF No. 255 at pp. 5-6.

**<u>Pre-Surgery Treatment (Count I)</u>**

For Count I, Plaintiff asserts that the Corizon Defendants' denial of adequate medical treatment from 2013 to 2017 caused his spinal condition to deteriorate.  ECF No. 210 ¶ 40.  For purposes of background,[3]  Plaintiff first underwent an MRI in 2005 and

---

[3]     The bulk of medical records chronicle Plaintiff's treatment beginning in May 2015.  It is unclear why earlier records have not been provided.  Corizon refuses to confirm Plaintiff's factual statements concerning his treatment prior to 2016 on the basis that Plaintiff rests on self-serving affidavits and the allegations of his complaint rather

was examined by an orthopedic specialist, Dr. Spears, who diagnosed Plaintiff with failed

back syndrome.[4]  In 2008, Plaintiff underwent another MRI, and Dr. Spears

recommended reconstructive back surgery to vertebra L3-L4, L4-L5, and L5-S1.  For

reasons that the parties dispute, Plaintiff did not undergo the procedure at that time.

Corizon claims that Plaintiff declined the procedure, while Plaintiff claims that it was

prevented by his placement in administrative segregation and subsequent transfer from

SCCC to SECC in December 2008.   Grievance correspondence from that time, filed

years later and discussed below, suggests that Plaintiff declined the surgery.  ECF No.

221-3 at p. 4.

Upon his transfer from SCCC to SECC in late 2008, Plaintiff's onsite doctor was

Dr. Glen Babich.  Plaintiff alleges in his complaint that Dr. Babich and Nurse Lizenbee

ignored Dr. Spears's diagnosis and recommendation for surgery.  An entry by Dr. Babich

dated April 9, 2009, indicates that Plaintiff wished to delay his surgery until he was

released from ad seg.  ECF No. 279-1.

In January 2012, Dr. Hakala (not named as a party) became Plaintiff's onsite

treating physician.  Plaintiff claims that Dr. Hakala prescribed steroid injections, a cane,

---

than medical records.  ECF No. 278 at pp. 22-27.  Yet Plaintiff's general chronology is
confirmed by Corizon's own expert, Dr. Paul Adler, in his report.  ECF No. 255-8.
Similarly, Plaintiff refuses to confirm many of Corizon's factual statements based solely
on inaccurate page citations to the medical records, though the facts are verifiable on
other pages.  ECF No. 255 at pp. 11-15.  Both parties' refusal to confirm basic
chronology in a voluminous medical record has only served to hinder this Court's review.
The Court will accept the general chronology in Plaintiff's complaint and statement of
facts for the period prior to 2015, absent evidence to the contrary on specific details.

[4]      A diagnosis of failed back syndrome indicates an unsuccessful spinal surgery,
where significant symptoms persist after surgery.

extra blankets, a handicap cell, ankle and back braces, and recommended transportation in a handicap van.  ECF No. 255 ¶ 230.[5]  In May 2012, Dr. Hakala ordered an open MRI, which Plaintiff evidently received.  ECF No. 255-3 at p. 3.  Plaintiff claims that he continued to request the surgery recommended by Dr. Spears in 2008.  *Id.*

In March 2013, Defendants Dr. Birch, Nurse R. Graham, and Nurse Hill became Plaintiff's onsite treating physicians and care providers at SECC.   In August 2013, the Corizon Health East Missouri Regional Director, Cindy Shupp, provided a written response to Plaintiff's request for back surgery stating that Dr. Halaka recommended an injection as the most prudent course of action.  ECF No. 255-3 at 3; ECF No. 269-3 at 25.

Plaintiff requested spine surgery again in July 2014 and was advised by SECC's Health Services Administrator at the time, Brandi Juden, that he had to go through the proper medical process to receive a referral for a consultation with a back surgeon.  ECF No. 255-3.

The bulk of relevant medical records in evidence begin in 2015 and are voluminous.  The following summarizes some entries noted by the parties in their statements of fact or by this Court on review of the record.  In June 2015, Dr. Birch and Nurse Graham processed a request for new orthopedic shoes for Plaintiff, which was approved.  In September 2015, Nurse Graham saw Plaintiff for back pain and gave him

---

[5]     Neither party provides documentary evidence to support or refute Plaintiff's assertions with respect to Dr. Hakala's recommendations.  Plaintiff simply alleges these facts in his pleadings, and Corizon denies them on that basis, as discussed in footnote 3. ECF No. 278 at p. 25.  Dr. Adler's report confirms that Plaintiff received steroid injections in 2012.  ECF No. 255-8.

ibuprofen.  In November 2015, Plaintiff was admitted to the TCU with urinary

complaints.  A urine analysis was negative, but Plaintiff was noted to have a history of

urinary tract infections.

In January 2016, Nurse Graham saw Plaintiff in the chronic pain care clinic, but

Plaintiff refused psychiatric medications.  In early March 2016, Dr. Birch saw Plaintiff

for back pain and noted that he had received two steroid injections but could not tolerate

a third.  Dr. Birch referred Plaintiff to a neurosurgeon, but the request was denied because

Plaintiff needed an updated MRI first.  Later that month, Dr. Birch completed a referral

for an open MRI of Plaintiff's spine, and the referral was approved.  In April 2016,

however, Plaintiff refused the medical out-count for the MRI because he did not want to

be transported in a cage van for fear of further damage and pain. ECF No. 255 at 8.  Over

the next several weeks, Plaintiff continued to complain of back pain and was treated by

various Corizon Defendants.

In July 2016, Nurse Graham saw Plaintiff in the chronic pain clinic and noted that

Plaintiff agreed to the out-count for an MRI as long as the MRI was open.  Plaintiff was

subsequently approved for an open MRI of his lumbar spine.  On July 27, 2016, Plaintiff

was sent to Saint Louis University Hospital for an MRI, but, after trying both the regular

and open machines, did not complete it due to anxiety and claustrophobia.   ECF No. 221

at p. 38.

Also in July 2016, Plaintiff filed a grievance regarding the back surgery forgone in

2008.  In the response, dated August 6, 2016, Dr. Birch and Nurse Barton explain that,

according to treatment notes at the time, Plaintiff reported that he was not mentally stable

7

enough for surgery and that he wished to have surgery after his release from prison.[6]
ECF No. 221-3 at p. 4-5.   In response on appeal dated September 2016, Dr. Bredeman
stated that he had reviewed Plaintiff's medical records and found that Plaintiff had been
"closely followed" by medical staff, received treatment in multiple chronic care clinics,
and saw a physician when medically indicated.   ECF No. 221-3 at p. 3.

        In October 2016, Nurse R. Graham met with Plaintiff, discussed the need for an
MRI, and noted that Plaintiff was walking and doing stretches on his own.   On October 7,
2016, Plaintiff completed an MRI under sedation at Saint Louis University Hospital.
Upon review of the MRI, Nurse R. Graham completed a referral request for a
neurosurgeon.   The referral was approved and then discussed with Plaintiff.

        In November 2016, Plaintiff saw a neurologist, Dr. Jeff Lehmen, who made a
diagnosis of severe L3-L4 stenosis and previous L4-L5, L5-S1 laminotomy with some
residual/recurrent stenosis.   Plaintiff received an explanation of the findings and potential
surgeries and risks.   Dr. Lehmen submitted a request for Plaintiff to undergo surgery.
Prior to approval, Plaintiff underwent tests performed by a cardiologist, the results of
which were discussed with Plaintiff.

        In December and January 2017, Plaintiff was seen by a cardiologist and ultimately
cleared for surgery.   On February 14, 2017, Plaintiff underwent reconstructive spine

---

[6]        Plaintiff argues that Nurse Barton's explanation – i.e., that Plaintiff refused
surgery in 2008 – should be discounted because Barton worked with Plaintiff's wife's ex-
husband (a corrections officer at SCCC) and therefore had a bias against Plaintiff.   The
Court does not find this material for purposes of summary judgment analysis.   Moreover,
Nurse Barton is not the only source of evidence of Plaintiff's refusal in the record.

surgery by Dr. Lehmen at Saint Mary's Hospital in Jefferson City.  Plaintiff was

discharged the following day, February 15, 2017.  Dr. Lehmen's discharge instructions

were as follows:

> Limit yourself to light, quiet activities until your f/u visit.
> Do not lift anything over 10 lbs until f/u visit.
> Do not push or pull anything until your f/u visit.
> You should not bend at the waist to pick anything up.
> If you need to pick something up, you should squat using your legs.
> Keep incision clean and dry.
> Okay to shower with incision covered.
> Pat incision dry and place dry gauze dressing and tape.
> No ointments to incision.

ECF No. 221-1 at p. 70.  Dr. Lehmen's notes do not reflect what if any pain medications

were prescribed or recommended upon discharge, nor do they prescribe anything for

Plaintiff's kidneys.  ECF No. 221-1 at p. 71.[7]

Corizon submits the expert report and deposition excerpts of Dr. Paul Adler, a

medical director of a correctional system in California with 17 years' experience.

Dr. Adler reviewed Plaintiff's medical records and opined that Corizon's medical care

was "clearly within the standard of care."  Dr. Adler noted the following.  Starting in

2012, Plaintiff received physical therapy; he received steroid injections; he underwent an

MRI in May 2012 and there was no reason to do another one the following year; Plaintiff

refused surgery for a variety of reasons; in 2015 Plaintiff was prescribed a new

medication; in March 2016 he was referred to a neurosurgeon for surgery and underwent

another MRI, this time under sedation due to his anxiety; Plaintiff was seen not using his

---

[7]      Dr. Lehmen's notes do list several other medications, such as blood thinners,
laxatives, and insulin.

cane for support, its necessity questionable; and Plaintiff received a full cardiac work-up before his surgery.  Dr. Adler noted that, between 2009 and 2017, Plaintiff was seen for almost every sick-call request, with over 60 self-declared emergencies often consisting of a headache.  Dr. Adler opined that Plaintiff's medical care was "clearly within the standard of care."

### Post-Surgery Transportation (Count II)

On February 15, 2017, MDOC Defendant Officers Barck and Moses were assigned to transport Plaintiff from St. Mary's Hospital to the nearby JCCC, where he was to spend the night in the infirmary before returning to SECC the next day.   In Count II of his complaint, Plaintiff alleges that the officers "dumped" him into a wheelchair, forced him to step up four feet and bend over to get into a cage van, while physically assaulting him, and then dragged him out of the van with the help of Defendant Officer Kottwitz and placed him in a wheelchair.  Plaintiff further alleges that Defendant Officers Whittle and Patten observed these actions and failed to intervene.  Plaintiff asserts that MDOC administrator Defendants Precythe, Earls, Cassady, and Friesen failed to train officers on the proper transport of prisoners after surgery and tacitly allow the use of excessive force.  ECF No. 210 pp. 17-18.

As a matter of practice, when transport officers retrieve an inmate from the hospital, they usually receive his discharge papers in a sealed envelope to be remitted to a nurse at the corrections facility on arrival.  ECF No. 226-8 at p. 15.  According to MDOC policy, offenders are to be transported in the most secure manner possible.  ECF No. 226-7.  Though disabilities are considered, safety and security are first priorities.  *Id.*

10

Administrative personnel have final authority as to what type of vehicle should be used to transport an offender.  *Id.*

Officers Barck and Moses used a cage van to transport Plaintiff from the hospital to JCCC.  MDOC Officer Richard Brown transported Plaintiff from JCCC to SECC after his surgery.  He testified in deposition that a lot of institutions, including JCCC, require the cage van if an inmate has attempted to escape, regardless of the inmate's preference.  According to an MDOC violations report, Plaintiff attempted to escape in 1993.  ECF No. 226-2.  Officer Brown testified that generally a sergeant or superior officer can determine the appropriate vehicle, and SECC had stopped transporting Plaintiff by cage van and instead agreed to transport him by way of handicap-equipped vehicle due to his claustrophobia.  ECF No. 226-8; ECF No. 267-4 at p. 4.  Officer Brown transported Plaintiff from JCCC to SECC in a Dodge Caravan, which Brown noted is "a lot easier to get into."  ECF No. 226-8 at p. 10.  The record does not illuminate whether JCCC was aware of SECC's accommodation for Plaintiff in this regard.

Upon Plaintiff's discharge from St. Mary's Hospital, Officers Barck and Moses wheeled Plaintiff from the hospital exit to the MDOC cage van in the parking lot.  Plaintiff claims that the officers handled him with excessive force in placing him in the van, causing him to fall into it face-down, where he lay for the duration of the 20 to 30-minute drive to JCCC.  Video footage from the hospital parking lot (ECF No. 226-13) shows that the officers opened the back of the van, unfolded stepping stairs, wheeled Plaintiff to the base, flanked him on each side, and slowly lifted him by the arms from the wheelchair into a standing position.  After 50 seconds, Plaintiff took one step up, then

11

two more, with the officers supporting him.  After 25 seconds, Plaintiff ducked his head into the van.  Over the next 55 seconds, the parties slowly positioned Plaintiff into a seat on the righthand side of the back of the van, Officer Moses entering the van with Plaintiff and Officer Barck remaining just outside the van, next to the stairs.  Plaintiff's left foot is visible facing forward from a seated position (toward the center of the van).  After nearly 90 seconds, Officer Moses exited the van and the parties departed.  Though clearly Plaintiff struggled to climb into the van, the video does not depict any use of force by either officer.

The record contains a declaration by Officer Moses stating that he and Officer Barck were not informed about Plaintiff's medical condition, his reason for hospitalization, or his physical restrictions; they did not choose the vehicle for transportation; no one from the hospital informed them of Plaintiff's physical restrictions, need for assistive devices, or need for a handicap vehicle; Plaintiff was able to step up into the van with assistance; Plaintiff was properly and appropriately removed from the van and taken to the JCCC infirmary; and they did not at any point use excessive force. ECF No. 226-5.

The record also contains audio recordings of interviews of Officers Moses and Barck and Plaintiff by MDOC investigator, Sarah Stokes.  ECF No. 267, Ex. 3, 7, 9.  In those interviews, Officer Moses stated as follows.  He secured the "belly-chain" loosely around Plaintiff's waist because he knew that Plaintiff had just had back surgery. (Officer Moses commented that he had had back surgery before, too.)  Though Plaintiff voiced some discomfort and pain, "he got in there, we strapped him in."  Plaintiff "was a

12

big man" (6'1" and 250 pounds), and "there was no way Barck and I could get him down [from the van]," so Officer Kottwitz assisted, and they placed Plaintiff in the wheelchair and wheeled him into the infirmary, where they removed his restraints and left him in the care of medical staff.  Officer Moses denied that Plaintiff hit his head or that any MDOC staff abused Plaintiff.  He said, "I'm sure he was in some discomfort, but I watched them give him two big pain pills before he left the hospital."  The van had seats on each side large enough to seat three people, and they strapped Plaintiff into a seat before departure. The officers were given a packet to transmit from the hospital to JCCC medical staff, but they had no specific knowledge or instructions with respect to Plaintiff's condition or transport arrangements.

Officer Barck, in her interview, recalled that Plaintiff was "whiny" and that Officer Moses was "really nice" and "really accommodating," trying to make sure that Plaintiff's restraints did not hurt him.  Officer Barck said that they stood on each side of Plaintiff and helped him up into the van, and that one of them entered the van to help Plaintiff sit and to secure Plaintiff's seatbelt while the other stood outside, as was standard practice.

Plaintiff, in his interview, acknowledged that he was "on a lot of drugs" and did not remember everything about his hospital stay.  He claims that Officer Moses hit the back of Plaintiff's legs to force his knees to buckle in order to lower his head into the van.  In the video, Officer Moses's hand can be seen behind Plaintiff's leg as Plaintiff attempts to duck his head into the van, but the video does not depict striking of any nature.  Plaintiff said that he fell into the van and lay there until the van arrived at JCCC.

13

Later, however, Plaintiff said that Moses pushed him up onto the seat and left him there.

Plaintiff said that, on arrival at JCCC, Officers Moses and Kottwitz lifted him from under

the arms and by the feet and dragged him into a wheelchair.  Plaintiff said that his wife

suspected that MDOC's use of a cage van to transport him was intentionally spiteful

"because of the past" (referring to the fact that her ex-husband works for MDOC), but

Plaintiff himself believed it was simply "done out of stupidity."

Defendants Whittle and Patten are surveillance officers.  Plaintiff does not recall

which one of them was on duty at the time of his arrival.  The record contains a

declaration by Officer Whittle stating that he did not witness Plaintiff's removal from the

van.  ECF No. 226-9.  JCCC has no record of a use of force on the day of Plaintiff's

arrival, so there is no video footage available.  ECF No. 269-2.

Plaintiff's formal grievance in connection with the foregoing events was denied.

ECF No. 269-3.

### Post-Surgery Treatment (Count III)

Upon Plaintiff's arrival at JCCC's infirmary, Nurse Rollins processed Plaintiff's

medical out-count return from St. Mary's and his admission to JCCC's infirmary, taking

his vital signs, documenting his pain scale, and noting Dr. Lehmen's discharge

instructions.  ECF No. 257-3 at p. 3.  Plaintiff was also seen that day and the following

day (at 8pm, 11pm, 2am, and 5am) by Nurse Prettyman, who gave Plaintiff 800

milligrams of ibuprofen and noted that his foley catheter was draining "straw colored

urine."  ECF No. 221 at p. 59.  Plaintiff's cane was in the nurses' office, and he was

resting quietly and denied any complaints.  ECF No. 221 at p. 59.  Nurse Brewer

14

examined Plaintiff before his departure.  She noted that Plaintiff reported numbness in his left thigh but elsewhere stated that Plaintiff had no concerns or complaints and was waiting to be transferred to SECC; she noted that Plaintiff's foley catheter was draining yellow urine; that Plaintiff had a wheelchair for mobilization; and that Plaintiff's cane was not allowed at JCCC.  She noted the restrictions on Plaintiff's activities per Dr. Lehmen's orders (e.g., no bending at the waist to pick up objects, no lifting more than 10 pounds).  Nurse Brewer called Nurse Lameta at SECC to convey reports.  ECF No. 221 at p. 60.

Plaintiff later filed a grievance in connection with his post-operative treatment at JCCC.  ECF No. 257-3.  According to Plaintiff, the JCCC nurses denied him adequate care by placing him in a holding cell in the medical infirmary for almost 24 hours without pain medication, denied him intravenous medication to protect his kidneys, denied him physical therapy, and did not return his cane.  ECF No. 210.  Upon review of his grievance appeal, Dr. Bredeman found that, on arrival at JCCC after his surgery, Plaintiff was given ibuprofen, provided a CPAP machine for nighttime use, and monitored throughout the night, resting quietly and expressing no complaints.  ECF No. 257-3 at p. 25.  He noted that Plaintiff's cane was secured at the nursing station because JCCC does not allow inmates to use canes.

On February 16, 2017, Plaintiff was returned to SECC and admitted to the Transitional Care Unit (TCU).  Dr. Birch saw Plaintiff that evening and ordered morphine for pain.  The next day, February 17, Dr. Birch reviewed Dr. Lehmen's recommendations, which are reflected in the visit record, and she changed Plaintiff's

dressing.  ECF No. 221 at pp. 63-66, 68.   Plaintiff was monitored throughout the day and

was given morphine by Nurse L. Graham.  ECF No. 221 at pp. 68.  His catheter was

removed, and he was able to urinate without problems.  *Id*. at 64.  It was noted that

Plaintiff was resting in bed but able to stand and transfer himself to a wheelchair to use

the bathroom.  *Id*.   Nurse Beasley called Plaintiff's wife to update her on his condition.

ECF No. 221 at 67.  Nurse Branum visited Plaintiff five times (2:45pm, 4pm, 9:35pm,

10pm, 10:40pm), administered medications, and noted that Plaintiff was resting with no

concerns.  ECF No. 221 at 69.

The record reflects that Dr. Lehmen's instructions were placed into Plaintiff's

medical records (e.g., ECF No. 221 at 65) and that Plaintiff was continually monitored

and given pain medication in the days following his surgery.  ECF No. 221 at 58-92.  For

example, on February 18, he received pain medication at 2am and 11:30am, and his

dressing was changed.  ECF No. 221 at 70-71.  On February 19, Nurse Branum checked

on Plaintiff four times (2:45pm, 3:15pm, 6pm and 8:45pm) and changed Plaintiff's

dressing after he showered; she administered pain medication and other medicines and

noted no complaints.  On February 20, Plaintiff received hydrocodone and was seen by

Dr. Birch, who noted that Plaintiff was ambulating with a walker, his pain level was

improving, and he had no chest or leg problems.  On February 22, Plaintiff reported that

the pain medicine was working.  Dr. Birch saw Plaintiff again on February 23 and told

him not to mop the floor.  Nurse Hill saw Plaintiff on February 24 and told him not to do

too much too soon.  On February 26, Plaintiff complained of pain while urinating and

was prescribed an antibiotic for bacterial infections.

On March 1, Nurse McNeil examined Plaintiff's incision and changed his dressing.  Plaintiff reported no more pain with urination.  On March 2, Dr. Birch saw Plaintiff and examined his incision and changed the dressing.  On March 7, Nurse Libenzee changed Plaintiff's dressing and noted some drainage.  ECF No. 221 at p. 84. Nurse McNeil noted that Plaintiff had a walker and a wheelchair and was able to perform activities of daily living.  ECF No.  221 at p. 85.   On March 9, Nurse Delisle removed two staples that had not previously been removed.  On March 20, Dr. Birch prescribed hydrocodone for 30 days.

On March 29, Plaintiff saw Dr. Lehmen for a follow-up appointment.  Treatment notes indicate that, though the incision area continued to drain, Plaintiff no longer wanted narcotic pain medication, which signaled that he was "doing well [and] progressing well."  ECF No. 220 at p. 20, ECF No. 221-3 at p. 10.  On March 30, Dr. Birch noted that she had spoken with Dr. Lehman's assistant after the visit, indicating that Plaintiff was "doing well post-op" with x-rays revealing good results such that no follow-up was recommended.  She also noted the change in pain medication.  ECF No. 221 at p. 87.

On April 5, Dr. Birch spoke again with Dr. Lehman's assistant to discuss Plaintiff's discharge from the TCU.  ECF No. 221 at p. 88.  Dr. Birch noted instructions for dressing changes and a low bunk on a low floor.  She noted that the incision had closed.  She noted that Plaintiff would no longer use the walker because it made his back hurt; rather, he preferred to push a wheelchair in front of him or get his cane back.  Dr. Birch concluded that Plaintiff did not need any assistive device, as he was nearly two-

months post-operative, and Dr. Birch had observed Plaintiff walking without assistance.[8]
*Id*. at 89.  Plaintiff was unhappy with this recommendation.  *Id*.  Nurse McNeil noted that
Plaintiff's incision was slightly pink, much improved, with no drainage or sign of
infection.  ECF No. 279 at p. 21.  Plaintiff was discharged from the TCU.

In May 2017, Plaintiff complained of kidney issues, which he had also
experienced years prior to surgery.[9]  Defendant R. Graham ordered a urine analysis,
which came back negative and within normal limits.  Plaintiff continued to report pain
with urination and in his kidneys.

Also in May 2017, Plaintiff filed an IRR complaining that his cane was taken from
him.  In response dated July 2017, Nurse Dawn Wade noted that Plaintiff was seen for
low back pain on June 21, 2017, and there was "no indication for [a] cane" at that time.
ECF No. 221-3 at p. 7-8; ECF No. 221 at p. 96.

Plaintiff filed a grievance in late July 2017 complaining that his chronic medical
needs were not being adequately evaluated or treated.  ECF No. 221-3 at p. 6.  On July
19, Nurse R. Graham saw Plaintiff in the chronic care clinic.  He complained of kidney
problems and also expressed dissatisfaction about his post-operative treatment.

On July 28, Nurse L. Graham observed that Plaintiff had difficulty urinating.  In
August 2017, he was approved to see a urologist, who suggested a renal ultrasound,
speculating that that Plaintiff may have developed a urethral stricture from trauma from

---

[8]     Dr. Birch also noted that Plaintiff had a special brace for his ankle, but she had
never seen him use it.

[9]     Plaintiff admits that he had complaints of weak urination in 2010 and 2011.

the catheter during surgery.  ECF No. 221-1 at p. 4; ECF No. 269 at p. 10.  A cystoscopy was scheduled and later performed in October 2017.  ECF No. 221-1 at p. 5.

In September 2017, Nurse Leija and Medical Director Dr. Philip Tippen responded to Plaintiff's grievance noting that Plaintiff was seen onsite monthly for his chronic conditions and had been referred to an off-site specialist, with additional appointments pending.  ECF No. 221-3 at p 6.  Over the next months, Plaintiff continued to have issues urinating and continued seeing his urologist.  Plaintiff also used a straight catheter when needed.  In November 2017, Plaintiff received a bilateral ultrasound, the results of which were unremarkable.

In February 2018, Plaintiff saw Defendant Nurse R. Graham in the chronic pain clinic.  Graham referred Plaintiff for physical therapy, and Plaintiff had six physical therapy visits, after which he reported feeling better.  Plaintiff also received therapy in the form of Transcutaneous Electrical Nerve Stimulation (TENS).  Nurse Lizenbee noted that Plaintiff would not allow the TENS unit to be dialed above zero, but Plaintiff reported that it helped.  Plaintiff continued therapy and was able to walk multiple times a day without difficulty or assistive devices.

In June 2018, Dr. Tippen examined Plaintiff to determine if an additional MRI of his lower back was needed.  ECF No. 221-1 at pp. 97-99.  Dr. Tippen requested an MRI, but the request was denied, and Plaintiff was ordered to continue with his current treatment plan.  *Id*.; ECF No. 255-7 at p. 4.  In July, Dr. Tippen ordered an increase in Plaintiff's tramadol.  Plaintiff refused his medication on August 1 and 2.  On August 20, Nurse Graham saw Plaintiff in the chronic pain clinic and noted a need for a handicap

19

cell with a raised toilet.  On September 28, it was noted that Plaintiff elected to take his tramadol twice daily rather than three times daily as prescribed.

In October 2018, Plaintiff was seen by Dr. Joyce Wilson and given injections for pain in his right hand.  In January 2019, Nurse R. Graham saw Plaintiff for a physical exam and completed a referral request for an orthopedic specialist for Plaintiff's right ankle and leg pain, which was approved.  In February 2019, Dr. Johnathon Strong ordered a cortisone injection and follow-up, as well as Plaintiff's use of a walker.  In March, Nurse R. Graham ordered a lay-in restriction for a wheelchair for Plaintiff.

In April 2019, Dr. Tippen requested another MRI.  The request was denied, and an electromyogram recommended instead.  ECF No. 255-7 at p. 6.  Dr. Tippen accepted that recommendation and did not appeal the denial of the MRI.   In May, Nurse R. Graham completed a referral for a custom fit ankle brace, for which Plaintiff was evaluated in June 2019.  Dr. Tippen approved Plaintiff to be transported by handicap van between May and November 2019.  ECF No. 221-1 at p. 90.  Dr. Tippen approved a handicap shower from May 2019 to May 2020.  *Id*. at 91.  Nurse R. Graham approved Plaintiff's use of a wheelchair from March to September 2019.  *Id*. at 92.  In February 2020, Plaintiff was examined by another outside physician, Dr. Sharmila Suri, who noted that Plaintiff presented with progressive weakness in his extremities; she referred him for an MRI, full blood work, and EMG nerve conduction study.

Corizon's expert, Dr. Adler, found no evidence that Plaintiff received inadequate post-operative care or that Defendants failed to follow Dr. Lehmen's orders.  ECF No. 255-8.  Dr. Adler opined that Plaintiff received care comparable to all community

standards.  He summarized as follows.  Plaintiff received intravenous fluids and pain

medications.  He received physical therapy while at JCCC.  Upon return to SECC, his

sutures were examined daily.  Plaintiff was observed exerting himself beyond doctor's

orders on several occasions.  Plaintiff received antibiotics for infections.  On a call on

April 5, 2015, Dr. Lehmen recommended no assistive devices, as Plaintiff was two

months post-operative.  Dr. Lehman counseled Plaintiff that surgery might not alleviate

his pain.  Plaintiff was referred to a urologist for complaints of urination problems (albeit

after seven years of recurrence).  Overall, Dr. Adler opined that Plaintiff received

"excellent care" at SECC but often refused to "optimize all the care that the entire

medical team gave him on a 24/7 basis."  ECF No. 255-8 at p. 7.  Dr. Adler found no

evidence of malpractice.

### Procedural History

Plaintiff originally filed this action in January 2017, prior to his back surgery.  The

Court appointed pro bono counsel in May 2017.  ECF No. 15.  The case was reassigned

within this Court four times.  ECF Nos. 35, 40, 41, 43.  Plaintiff amended his complaint

in September 2017, April 2018, and January 2020, adding defendants and factual

allegations as relevant to his surgery and ongoing treatment.  ECF Nos. 26, 98, 210.  This

Court dismissed certain defendants and claims in earlier proceedings.  ECF Nos. 69, 113,

207.  Defendants filed the present motions for summary judgment in late February 2020.

In mid-March 2020, the COVID-19 global pandemic necessitated (and continues to

cause) severe operational limitations on all aspects of the legal system.  Plaintiff's

appointed counsel requested and was granted multiple extensions of time to file his

21

responses in opposition to Defendants' motions, and Defendants received modest extensions for their reply briefs, such that this matter became ripe for review in early July 2020.

In his third amended complaint, Plaintiff asserts that the Corizon Defendants denied him adequate treatment before and after his surgery, in deliberate indifference to his serious medical needs (Counts I and III), and that the MDOC Defendants used excessive force when transporting Plaintiff from the hospital immediately after his surgery (Count II). The parties' arguments and additional facts in the summary judgment record are set forth below as relevant to Plaintiff's specific allegations against specific Defendants.

## DISCUSSION

### Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." The burden of demonstrating that there are no genuine issues of material fact rests on the moving party, and the court must view the evidence and the inferences that may be reasonably drawn therefrom in the light most favorable to the non-moving party. *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015). Once the moving party discharges its burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it relates to the legal elements of the claim. *Id.* A material fact dispute is genuine if the evidence

is such that a reasonable jury could return a verdict for the non-moving party. *Id*.  The

party opposing summary judgment may not rest on the allegations in its pleadings; it

must set forth specific facts showing that there is a genuine issue of material fact for trial.

*United of Omaha Life Ins. Co. v. Honea,* 458 F.3d 788, 791 (8th Cir. 2006).

At the summary judgment stage, courts do not weigh the evidence and decide the

truth of the matter but determine only if there is a genuine issue of material fact for

trial. *Anderson*, 477 U.S. at 249.  However, summary judgment may be appropriate when

"opposing parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it."  *Scott v. Harris*, 550 U.S. 372, 380

(2007).  In such circumstances, the mere existence of some alleged factual dispute will

not serve to defeat summary judgment; instead, the factual dispute must be

"genuine."  *Id.*

### Corizon Defendants (Counts I and III)

Plaintiff's Count I relates to his care prior to surgery and names as Defendants

Corizon, Drs. Birch, Hill, and Bredeman, and Nurses Barton, Lizenbee, McNeil, Rebekah

Graham, and Larry Graham.  Plaintiff's Count III relates to his care after surgery and

names as Defendants Corizon, Drs. Birch, Hill, and Bredeman, and Nurses Rollins,

Prettyman, Hawkes, Brewer, Leija, McNeil, Lizenbee, Rebekah Graham, and Larry

Graham.[10]   Plaintiff's statement of facts contains additional allegations specific to each

Corizon Defendant.  Corizon's summary judgment brief groups individual Defendants

---

[10]      Nurse Roxanna Anderson is also mentioned in the body of the complaint but is not
named as a defendant in this case.

23

according to their role in Plaintiff's care both before and after surgery.  The Court will
address the parties' arguments in the order presented in their briefs.

### Legal Standard

As relevant to Plaintiff's claims against all Corizon Defendants (Counts I and III),
a prisoner's Eighth Amendment rights are violated if prison officials exhibit deliberate
indifference to the prisoner's serious medical needs.  *Farmer v. Brennan,* 511 U.S. 825
(1994).  A claim of deliberate indifference involves both an objective and subjective
standard.  *Wilson v. Seiter,* 501 U.S. 294, 298 (1991).  A prisoner's claim amounts to a
constitutional violation only when the plaintiff shows that (1) he suffered objectively
serious medical needs and (2) prison officials actually knew of but deliberately
disregarded those needs.  *Hines v. Anderson*, 547 F.3d 915, 920 (8th Cir. 2008).  A
serious medical need is one that has been diagnosed by a physician as requiring
treatment, or one that is so obvious that even a layperson would easily recognize the
necessity for a doctor's attention.  *Santiago v. Blair*, 707 F.3d 984, 990 (8th Cir. 2013).

To support a claim of deliberate indifference under § 1983, a prisoner must show
more than negligence and more even than gross negligence.  *Johnson v. Leonard*, 929
F.3d 569, 575 (8th Cir. 2019).   Deliberate indifference is found where medical care is so
inappropriate as to evidence intentional maltreatment.  *Id*.  The level of culpability
required to demonstrate deliberate indifference is akin to criminal recklessness.  *Id*. at
576.  Inmates have no constitutional right to receive a particular or requested course of
treatment, and mere disagreement with treatment decisions does not rise to the level of a
constitutional violation.  *Id*. at 578; *Hines*, 547 F.3d at 920.  "Whether a

prison's medical staff deliberately disregarded the needs of an inmate is a factually intensive inquiry. *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118 (8th Cir. 2007). The plaintiff must clear a "substantial evidentiary threshold" to show that medical staff deliberately disregarded his needs. *Id*. An inmate cannot create a question of fact merely by stating that he received inadequate treatment. *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997).

When an inmate's claim is based on a delay in treatment, he must show that the alleged deprivation was objectively serious, as measured by the effect of the delay, and that the defendant was deliberately indifferent to the inmate's health. *Jackson v. Riebold*, 815 F.3d 1114, 1119 (8th Cir. 2016). In order to create a genuine issue of fact on a claim involving delayed treatment, the plaintiff must submit evidence establishing that the delay had a detrimental effect. *Id*.

**Corizon Health, Inc.**

To support a claim against a prison's medical contractor under §1983, a plaintiff must show that there was a policy, custom, or official action that inflicted an actionable injury. *Harris v. Corizon, LLC*, 4:17-CV-2617 PLC, 2020 WL 5531548, at *5 (E.D. Mo. Sept. 15, 2020) (quoting *Johnson v Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006)). Corizon asserts that Plaintiff has failed to articulate any specific policy or custom that adversely affected his medical care; on the contrary, its policies ensure that inmates receive continual care, which Plaintiff received here, as evidenced by the medical records.

Plaintiff suggests that Corizon's denials of his requests for MRIs and delay in providing surgery creates a triable question whether there was a pattern amounting to a custom of unconstitutional conduct.  In reply, Corizon reiterates that Plaintiff's extensive medical records belie any pattern of unconstitutional indifference, and Plaintiff's disagreement with a course of treatment does not rise to a constitutional violation. Corizon also notes that Plaintiff frequently refused the care offered to him.

The Court agrees with Corizon that the record does not give rise to a genuine factual question whether Corizon's practices evidence a pattern of actionable injury.  The record reflects that Plaintiff received ongoing care from Corizon's clinical professionals and significant attention from its administrative personnel.  Plaintiff received MRIs in 2005, 2008, 2012, and 2016, the last requiring three attempts in two separate visits.  The parties do not dispute that Plaintiff *was* scheduled for surgery in 2008.  The fact that Plaintiff did not receive all the services or surgeries he requested does not demonstrate an unconstitutional pattern or even create a triable issue, regardless of the parties' dispute about the specific reasons why the 2008 procedure did not occur.  *See Johnson*, 929 F.3d at 577 (noting that the parties' competing narratives about prior authorizations and reasons for delay did not preclude summary judgment because it did not impact the outcome).  Even accepting Plaintiff's version of the facts, the record still would not permit a reasonable juror to conclude that Corizon promoted practices tantamount to deliberate indifference.

Furthermore, the evidence does not establish that the delay in surgery had a negative effect.  As Dr. Adler explained in his report, Plaintiff has a chronic and

26

degenerative condition that will get worse over time, the only reliable treatments being weight loss and physical therapy.  ECF No. 255-9 at p. 4.  Plaintiff himself noted that Dr. Spears diagnosed him with "failed back syndrome" due to an earlier unsuccessful surgery.  While the MRIs over time showed a "natural progression of the disease," Dr. Lehman warned Plaintiff in 2017 that there was no guarantee, and the benefits might not occur."  *Id*.; ECF No. 221-1 at p. 58.  Even after surgery, Plaintiff's spinal condition continued to deteriorate, as evidenced by his physical in February 2020.  ECF No. 255-2. Plaintiff provided no contrary expert testimony suggesting that the delay in Plaintiff's surgery (even assuming it was not self-determined) had a detrimental effect.

### Nurse Hawkes

Nurse Hawkes is the Corizon employee who obtains information from the hospital when an inmate is returning to the prison (e.g., discharge instructions, patient notes) and forwards that information to the facility.  Plaintiff asserts that Hawkes failed to obtain his discharge instructions from Dr. Lehmen, resulting in a delay in post-operative care, specifically Flomax for his kidneys.

Corizon argues that Hawkes lacked any knowledge of Plaintiff's serious medical need and cannot be liable for any denial of medical care because she does not see or treat inmates, has no managerial control in the facility, and does not participate in any policy implementation.  *See Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985) (holding that a claim under §1983 requires that the defendant be personally involved in or directly responsible for the incidents that deprived Plaintiff of his constitutional rights).  Put simply, Corizon argues that Hawkes had no involvement in Plaintiff's care, so no

27

reasonable jury could find in favor of Plaintiff.  In response, Plaintiff states that he filed a grievance on the matter and attempted to obtain a copy of the records himself.  Plaintiff submits that his own statements and the medical records at least create a triable question.

The Court is unable to discern from the record any triable fact with respect to Nurse Hawkes and Plaintiff's deprivation of Flomax.  In his deposition, Plaintiff testifies, based on his own medical records, that a nurse from St. Mary's called Nurse Brewer at JCCC with information about Plaintiff's medical needs.  ECF No. 255-1 at p. 141. Plaintiff also states that "Stacey Hawkes had [the records] called in to her."  *Id*. at 145. Dr. Lehmen's discharge notes do not reference Flomax or any other kidney medication (ECF No. 221-1 at p. 71), and Dr. Adler stated in his report that Dr. Lehmen did not order Flomax.  ECF No. 255-8 at p. 5.  The medical records reflect that Plaintiff had a Foley catheter after surgery; his urine was normal; the catheter was removed; and Plaintiff was able to urinate normally.  Days later, he developed an infection and was given antibiotics. The records also reflect that nurses at St. Mary's, JCCC, and SECC were in communication from the time of his discharge, through his layover at JCCC, to his return to SECC; that Plaintiff's discharge papers were transmitted by the transport officers; and that Dr. Lehman's discharge instructions were entered into Plaintiff's prison medical records.  Plaintiff fails to identify any evidence in the record reflecting Nurse Hawkes's direct involvement in the transmission of Plaintiff's records at all, let alone her alleged neglect or indifference.

28

**Defendants Bredeman, Leija, and Barton**

Plaintiff alleges that Dr. Bredeman and Nurses Leija and Barton were deliberately indifferent to his medical needs by denying his formal grievances.  In their motion for summary judgment, these Defendants respond that they had only limited and indirect interactions with Plaintiff; they investigated and responded to Plaintiff's grievances; they ascertained his medical needs and addressed them accordingly; and they did not ignore Plaintiff's requests for health services.

Plaintiff concedes that these Defendants followed up on Plaintiff's medical grievances but argues that their responses were not always timely and were usually denied.  Plaintiff asserts that Nurse Leija's response took two years in one instance, and Nurse Barton was biased against Plaintiff due to ex-spousal connections.[11]  Plaintiff thus submits that a reasonable jury could find deliberate indifference.

Plaintiff's argument ignores applicable legal standards.  As previously stated, the level of culpability required to demonstrate deliberate indifference is akin to criminal recklessness.  *Johnson*, 929 F.3d at 575.   Plaintiff does not allege that these Defendants failed to give due consideration to his grievances.  Their denials alone, and even if untimely, do not give rise to an inference of criminal recklessness.  Inmates have no constitutional right to receive a particular or requested course of treatment, and mere

---

[11]     Plaintiff appears to attack Nurse Barton's credibility as relevant to her notation that Plaintiff refused surgery in 2009.  ECF No. 221-3 at p. 4.  As previously noted, the Court does not find this issue material, and Nurse Barton's notation is not the only evidence in the record suggesting that Plaintiff declined the surgery.  *See e.g*., ECF No. 279-1.

disagreement with treatment decisions does not rise to the level of a constitutional

violation.  *Id*. at 578; *Hines*, 547 F.3d at 920.

**Defendants Birch, Hill, and R. Graham**

Plaintiff asserts that Drs. Birch and Hill and Nurse Rebekah Graham allowed his

condition to deteriorate in the years before his surgery and failed to follow Dr. Lehmen's

treatment plan after surgery.  In its motion for summary judgment on behalf of these

Defendants, Corizon observes that the record reflects constant, ongoing care for Plaintiff,

including 50 visits with Nurse Graham between 2015 and 2019.  Plaintiff does not

dispute the accuracy of these medical records.  Corizon argues that Plaintiff merely

disagreed with his providers' medical judgment and was not entitled to his requested

form of treatment.

Indeed, the medical evidence summarized above shows that these Corizon

Defendants actively attended to Plaintiff's complaints and referred him for diagnostic

procedures and outside specialists.  To be sure, the medical records over time reflect a

progression of Plaintiff's spinal condition.  But this alone is not sufficient to permit an

inference of criminal recklessness by Defendants.  Plaintiff supplies no specific evidence

(e.g., expert opinion) indicating that Defendants' treatment decisions were unreasonable,

or that any delay in treatment adversely affected his condition, which is chronic and

degenerative.  As Dr. Lehmen warned Plaintiff and as Dr. Adler opined in his report,

Plaintiff's condition was bound to progress – regardless of the frequency of MRIs or even

surgical intervention.  Nothing in the record supports an inference that Defendants were

deliberately indifferent to Plaintiff's medical needs.  On the contrary, the record reflects

near constant attention and care.   Plaintiff's dissatisfaction with his treatment or disappointment in the persistence of his symptoms does not create a genuine issue of material fact.

### Defendants L. Graham, Lizenbee, McNeil, Brewer, Prettyman, and Rollins

Plaintiff asserts that SECC Nurses Graham, Lizenbee, and McNeil failed to provide adequate treatment both before and after his surgery.  He also specifically asserts that Nurse Lizenbee believed him to be faking his back injury.  With respect to JCCC Nurses Brewer, Pettyman, and Rollins, who staffed the infirmary during Plaintiff's overnight layover between St. Mary's and SECC, Plaintiff asserts that these Defendants failed to follow Dr. Lehmen's post-operative instructions with respect to pain medication, intravenous kidney medication, and physical therapy, and that they failed to return his cane.  Again here, Defendants assert that the medical records essentially speak for themselves and reflect frequent, ongoing, and reasonable care and compliance with Dr. Lehmen's instructions, thus precluding any finding of deliberate indifference.

In response, Plaintiff, submits that his own allegations, contained in his filings, declarations, and deposition, suffice to create a question of fact as to whether these Defendants were deliberately indifferent to his medical needs.  Plaintiff's position in this regard plainly ignores established summary judgment standards.  To defeat a motion for summary judgment, a plaintiff may not merely point to unsupported self-serving allegations but must substantiate allegations with sufficient probative evidence that would permit a finding in his favor.  *Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006).  Plaintiff points to no specific evidence outside his own statements from which a

reasonable jury could infer that these Defendants provided care so inadequate as to constitute deliberate indifference.  The medical records of Plaintiff's care in the days immediately following surgery and beyond plainly refute Plaintiff's allegations.  Mere disagreement with treatment decisions does not rise to the level of a constitutional violation.  *Popoalii v. Corr. Med. Services*, 512 F.3d 488, 499 (8th Cir. 2008).

Nothing in Dr. Lehmen's post-operative instructions references kidney medication or physical therapy.  At most, there appears to have been a gap in Plaintiff's pain management during his one-night layover at JCCC immediately after surgery insofar as he was given ibuprofen and did not receive morphine until his return to SECC.  While the Court sees no explanation for this discrepancy, this alone is insufficient to create a triable question of deliberate indifference, particularly in light of the greater record of that period, which also shows that JCCC Nurses checked on Plaintiff regularly and noted that he was resting quietly.  To support a claim of deliberate indifference, a plaintiff must show more than negligence and more even than gross negligence but rather conduct akin to criminal recklessness.  *Johnson*, 929 F.3d at 575.

The record does not invite an inference that any of the JCCC or SECC Nurses were deliberately indifferent to Plaintiff's post-operative medical needs.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott*, 550 U.S. at 380.  The record relevant to Plaintiff's claims against the Corizon Defendants could not lead a reasonable jury to find for Plaintiff.  Summary judgment is proper.

**MDOC Defendants**

For Count II of his complaint, Plaintiff asserts that MDOC Officers used excessive force when transporting him from St. Mary's to JCCC; that other officers failed to intervene to prevent harm to him, and that MDOC administrators promote policies or customs resulting in inadequately trained officers using excessive force when transporting post-operative prisoners. MDOC notes in its brief that Plaintiff also appears to claim that Defendants were indifferent to his medical needs in transporting him by cage van immediately after spinal surgery. MDOC addresses both theories and groups its Defendants by their roles. The Court follows the same sequence.

**Barck and Moses – Deliberate Indifference**

MDOC argues that a jury could not find Officers Barck and Moses deliberately indifferent to Plaintiff's serious medical needs because these Defendants were not the MDOC officials who determined what transport to use, they were told nothing of Plaintiff's condition, and, even if they were, Dr. Lehmen's discharge instructions contained no transport restrictions or movement restrictions implicated here (i.e., stepping and ducking). MDOC further argues that its policy prioritizes safety over accommodation, Plaintiff had previously attempted to escape, and the decision came from a superior officer. Plaintiff responds that Officers Moses and Barck had actual knowledge of his recent back surgery, and SECC had long since stopped transporting Plaintiff by cage van.

From the video footage, the Court accepts that Plaintiff experienced difficulty and discomfort as he struggled to climb into a non-accessible van the day after spine surgery.

But, even assuming that SECC had previously agreed to transport Plaintiff by handicap van, the record regarding Plaintiff's transport arrangements from St. Mary's to JCCC still does not permit an inference of deliberate indifference.  Again, this standard requires more than negligence or even gross negligence but rather a level of disregard akin to criminal recklessness.  Plaintiff himself recognized that the selection of vehicle was "done out of stupidity" and not malice.  While MDOC's failure to dispatch a handicap-accessible van arguably reflects a lapse in attention or judgment, the Court cannot say that a reasonable jury could find deliberate indifference by these individual Defendants.

### Barck, Moses, and Kottwitz – Excessive Force

More centrally, Plaintiff asserts in his complaint that MDOC Officers Barck, Moses, and Kottwize used excessive force in assisting him in and out of the van. A violation of the Eighth Amendment occurs when a prison official uses malicious and sadistic force against a prisoner with the intent and effect of injury.  *Williams v. Jackson*, 600 F.3d 1007, 1012 (8th Cir. 2010).

In his opposition to summary judgment on this count, Plaintiff contends that his own allegations alone are sufficient to create a triable fact on the issue.  As previously stated, Eighth Circuit precedent does not support Plaintiff's interpretation of the legal standard.  To defeat a motion for summary judgment, a plaintiff may not merely point to unsupported self-serving allegations but must substantiate allegations with sufficient probative evidence that would permit a finding in his favor.  *Conolly*, 457 F.3d at 876.

The video footage refutes Plaintiff's assertions with respect to the Officers' actions in assisting Plaintiff into the van.  The video shows that Officers Moses and

34

Barck made every effort to assist Plaintiff into the van slowly and gently.  It does not

support Plaintiff's allegation that they pushed him onto the floor face-down.  Rather, it

shows that they eased him into a seated position, and Plaintiff himself told Ms. Stokes

that Officer Moses put him in a seat.  Officer Barck said that Officer Moses was "really

nice" and "really accommodating."  Plaintiff admits that he was "on a lot of drugs" that

day.

      With respect to Plaintiff's subsequent exit from the van upon arrival at JCCC,

Plaintiff's allegations of excessive force are not as detailed.  He alleges that Officer

Kottwitz attempted to lift Plaintiff from under his arms while Officers Barck and Moses

pulled him out by the ankles.  ECF No. 266 at p. 4.  In a written statement for Ms. Stokes

dated March 21, 2017, Plaintiff states that the officers "dragged" him from the van feet

first and placed him into a wheelchair with his left leg dragging on the ground.  ECF No.

269-3 at pp. 10-11.  There is no video footage or witness testimony supporting Plaintiff's

allegation that these Defendants used excessive force in assisting him out of the van.[12]

Self-serving allegations are not sufficient to create a factual dispute.  *Conolly*, 457 F.3d at

876.  Moreover, even accepting Plaintiff's account of his transfer, which the Court

accepts to have caused discomfort, a jury could not reasonably infer from his description

that the officers used "malicious" or "sadistic" force with the *intent* to injure.

---

[12]      On April 17, Plaintiff filed a grievance appeal claiming that the officers' actions
were captured by surveillance cameras at JCCC.  *Id.* at p. 4.  But JCCC Capitan Myles
Strid verified by affidavit that the facility had no record of a use of force that day
involving Plaintiff, so the facility had no video footage to provide.  ECF No. 269-2.
Officer Curtis Whittle, a surveillance officer at JCCC, stated only that he did not see
Plaintiff being removed from the van that day.

Additionally, though not a threshold requirement, the extent of injury can be informative as to the likely degree of force applied.  *Santiago v. Blair*, 707 F.3d 984, 990 (8th Cir. 2013).  In his deposition, Plaintiff claims that, as a result of the officers' actions assisting him in and out of the van, he suffered injury to his urethra, injury to his eardrum, and infection of his incision.  MDOC notes that Plaintiff has not presented medical evidence or expert testimony confirming the existence of these injuries, much less causation attributable to excessive force in transport.

While the precedent cited in MDOC's brief is not entirely authoritative,[13] the Court nonetheless concludes that the record lacks evidence giving rise to triable issues of fact with respect to these allegations.  The evidence indicates that Plaintiff had a history of urinary problems long before surgery and was eventually referred to a urologist, who found urethral trauma from the catheter.  The post-operative record indicates that Plaintiff's urinary output was normal, both with the catheter and after its removal, although Plaintiff developed an infection a few days later and was given antibiotics. Records do not reflect complaints related to Plaintiff's ears, and no damage was noted in

---

[13]    MDOC relies on *Dawkins v. Graham*, 50 F.3d 532 (8th Cir. 1995), for the proposition that a claim of excessive force requires a showing of actual injury.  *Dawkins* was a Fourth Amendment case and moreover is no longer controlling law.  See *Chambers v. Pennycook*, 641 F.3d 898 (8th Cir. 2011) (holding that there is no requirement of more than *de minimus* injury to establish excessive force under the Fourth Amendment); and *Santiago*, 707 F.3d at 990 (noting that application of the wrong standard is reversible error).  MDOC relies on *Alberson v Norris*, 458 F.3d 762 (8th Cir. 2006), and *Robinson v Hager*, 292 F.3d 560 (8th Cir. 2002), for the proposition that, where the complaint involves treatment of a prisoner's sophisticated medical conditions, expert testimony is required to prove causation.  *Alberson* and *Robinson* are deliberate indifference cases involving medical treatment, not excessive force.

36

his latest physical examination.  ECF No. 255-2 at p. 3.  Plaintiff's incision was noted to be clean and healing well until four days after transport (February 19, 2017) after Plaintiff was seen exerting himself beyond Dr. Lehmen's orders.  Plaintiff does not dispute the accuracy of these medical records.  None of this evidence supports Plaintiff's assertion that he sustained injuries from any excessive force during transport.

The Court thus concludes that Defendants are entitled to summary judgment on Plaintiff's claims of excessive force during transport.

**Remaining MDOC Defendants**

Also in Count II, Plaintiff asserts that Officers Whittle and Patten failed to intervene to stop the use of force by Officers Barck, Moses, and Kottwitz; and that MDOC administrators failed to properly supervise and train its officers and promoted policies and practices that resulted in the foregoing alleged violations of his Eighth Amendment rights.

Plaintiff's claims against these remaining MDOC Defendants are entirely dependent on the viability of his primary claims against Officers Moses, Barck, and Kottwitz.  Having found no genuine issues of fact precluding summary judgment as to those Officers, the Court does not reach the merits of the parties' arguments with respect to the remaining MDOC Defendants.  To the extent Plaintiff challenges MDOC's transportation policy favoring security over accommodation, or its particular decision to transport Plaintiff by cage van after his surgery, again the record contains no evidence giving rise to triable issues of deliberate indifference.  Rather, as previously stated and as Plaintiff acknowledged in his testimony to Ms. Stokes, MDOC's failure to transport

Plaintiff by handicap van after surgery appears to have been an unfortunate oversight in this instance.

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380.  The record relevant to Plaintiff's claims against the MDOC Defendants could not lead a reasonable jury to find for Plaintiff.  Summary judgment is proper.

## <u>CONCLUSION</u>

The summary judgment record reflects that the Corizon Defendants provided ongoing care and treatment to Plaintiff both before and after his back surgery in 2017. Notwithstanding Plaintiff's dissatisfaction, the evidence does not give rise to genuine issues of material fact permitting a jury to find that Corizon Defendants acted with deliberate indifference to Plaintiff's serious medical needs.  The record also does not support Plaintiff's allegations of excessive force or deliberate indifference by MDOC Defendants in connection with his transport from the hospital after surgery.

Accordingly,

**IT IS HEREBY ORDERED** that the Corizon Defendants' motion for summary judgment is **GRANTED**.  ECF No. 219.

**IT IS FURTHER ORDERED** that the Missouri Department of Corrections Defendants' motion for summary judgment is **GRANTED**.  ECF no. 224.

All claims against all parties having been resolved, a separate Judgment shall accompany this Memorandum and Order.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 30th day of November 2020.